UNITED STATES of America,
Plaintiff–Appellee,

v.

Christine Yvette RODRIGUEZ,
Defendant–Appellant.

No. 97–50038.

United States Court of Appeals,
Fifth Circuit.

Dec. 31, 1997.

---

Richard L. Durbin, Jr., Asst. U.S. Atty., Joseph H. Gay, Jr., Asst. U.S. Atty., San Antonio, TX, for Plaintiff–Appellee.

Mary P. Stillinger, El Paso, TX, for Defendant–Appellant.

Before WISDOM, HIGGINBOTHAM and STEWART, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

A jury found defendant Christine Yvette Rodriguez guilty of participating in a scheme to sell firearms without a license to out-of-state residents, in violation of 18 U.S.C. §§ 371 and 922(a)(5). Rodriguez argues on appeal that the evidence was insufficient on her substantive count of conviction and that the trial court erred in instructing the jury on the conspiracy count. Finding both contentions without merit, we affirm.

## I.

In 1995, the Bureau of Alcohol, Tobacco, and Firearms conducted an undercover sting operation against a group of individuals in El Paso, Texas, that the Bureau suspected of illegal firearms sales. Rodriguez's fiancé Al-

bert Gomez, Jr. and Victor Edward Garcia operated a business in El Paso, called "The Bunker," which dealt in military surplus equipment and occasionally sold firearms. At the time of the offense, neither Gomez, Garcia, nor Rodriguez had a federal firearms license. Rodriguez was not a formal employee of "The Bunker," but she spent a great deal of time assisting in its business operations. Moreover, Gomez kept Rodriguez closely apprised of his business dealings.

In late 1994, Rodriguez, Gomez, and Mitchell Morgan purchased a large number of rifles from a firearms dealer in New Mexico. The size of the sale attracted the attention of the BATF, which began an investigation of Gomez's activities. In November 1995, the BATF learned that Gomez was interested in exporting firearms to Mexico. Acting on this tip, it initiated an undercover sting operation against Gomez. Posing as firearms brokers from New Mexico, government agents arranged a purchase of firearms from Gomez for December 12, 1995.

On December 12, Rodriguez drove Gomez and Garcia to a meeting with the undercover agents at an El Paso Burger King. On the way to the Burger King, Rodriguez told Gomez that she had a "funny feeling" about the transaction and suggested that he abort it. Gomez, however, insisted on going through with the deal. Once the group arrived at the restaurant, Gomez went inside to speak with the undercover agents, while Rodriguez remained outside in the parking lot and performed what government witnesses described as counter-surveillance operations. Gomez told the agents that his "wife" was in the parking lot acting as a lookout for him. During the transaction, Rodriguez telephoned Gomez to tell him that police cars were nearby.

Out of fear of police activity in the area, Gomez informed the undercover agents that he preferred to complete the firearms sale at a nearby Furr's supermarket. Gomez drove to the supermarket in the agents' vehicle, followed by Rodriguez in her own car. Once at the Furr's, Rodriguez began a conversation with the driver of a black truck, whom Gomez identified to the agents as another lookout. After the other participants in the

scheme arrived at the supermarket with the firearms that were to be sold, the agents arrested all the conspirators. Rodriguez then made a voluntary statement to the authorities, offering innocent explanations for her activities. Nevertheless, Rodriguez was indicted on one count of selling firearms without a license to out-of-state residents and one count of conspiracy.

Garcia pled guilty and was a witness for the government at Rodriguez's trial. Garcia testified that Gomez generally shared all information with his fiancé, Rodriguez, and that Rodriguez spent a lot of time helping Gomez with his business activities. Garcia also stated that Rodriguez was aware that the only individual associated with "The Bunker" who had a valid firearms license, Kevin Dacey, had left the business several months earlier. Garcia further testified that Rodriguez knew that Gomez was going to sell a large quantity of firearms and that the buyers would be from out of state.

Rodriguez took the stand in her own defense. She admitted that when she and her associates had gone to procure the firearms in New Mexico, she knowingly gave false information on the firearms' purchase documents. She denied, however, participating in a conspiracy to sell firearms to out-of-state residents; instead, she contended that she was innocently accompanying her fiancé to the Burger King. She claimed that her concerns about the presence of police officers in the area were based on the fact that the registration sticker on her automobile had expired.

The jury convicted Rodriguez on both counts. She timely filed this appeal.

## II.

Rodriguez's first contention on appeal is that the evidence was insufficient to convict her on the substantive firearms count. She argues that the government failed to prove that she had knowledge of the specific legal prohibition against selling firearms without a license to out-of-state residents, as required by 18 U.S.C. § 924(a)(1)(D). Although Rodriguez has stated the proper legal standard for a conviction under § 924(a)(1)(D), we find

that the government offered sufficient evidence to demonstrate Rodriguez's knowledge of the law.

Title 18, § 922(a)(5) prohibits the sale of firearms to out-of-state residents, where either the seller or the purchaser lacks a federal firearms license. Section 924(a)(1)(D), however, provides that only those who violate § 922(a)(5) "willfully" shall be punished. As the Supreme Court has noted, "willful ... is a word of many meanings, its construction often being influenced by its context." *Spies v. United States*, 317 U.S. 492, 497, 63 S.Ct. 364, 367, 87 L.Ed. 418 (1943). We have yet to comment on the meaning of "willfully" as contained in § 924(a)(1)(D), but the majority of circuits that have confronted the question have concluded that a "willful" violation of §§ 922(a)(5) and 924(a)(1)(D) requires a defendant to have actual knowledge of the law. *See United States v. Sanchez–Corcino*, 85 F.3d 549, 553–54 (11th Cir.1996); *United States v. Hayden*, 64 F.3d 126, 130 (3d Cir. 1995); *United States v. Obiechie*, 38 F.3d 309, 315–16 (7th Cir.1994); *United States v. Hern*, 926 F.2d 764, 767 & n. 6 (8th Cir.1991).

Two key factors support the majority reading of the statute. First, the legislative history of the Firearms Owners' Protection Act, Pub.L. No. 99–308, 100 Stat. 449 (1986), confirms that Congress intended that convictions under 18 U.S.C. § 922(a)(5) require knowledge of the law on the part of the defendant. *See Hayden*, 64 F.3d at 130. Reliance on legislative history in this case is somewhat complicated by the fact that FOPA proceeded through an unusual legislative course. FOPA took seven years to enact and was reported out of committee against the wishes of the congressional leadership. As a result, the House Report on what ultimately became the Act argues for why it should be rejected, and there was no Senate Report at all on the final bill. *See* David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal Perspective*, 17 Cumb. L.Rev. 585, 585–88 (1987). Nevertheless, the House Report

on the Act instructed Congress that convictions would be rare because willfulness required knowledge of the law. *See* H.R.Rep. No. 495, at 8–9, 18 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1334–35, 1344. Additionally, during the floor debate on the bill, members of Congress were repeatedly informed that knowledge of the law would be necessary for a criminal conviction. *See, e.g.,* 132 Cong. Rec. H1684, H1671 (daily ed. Apr. 9, 1986); *see also* Hardy, *supra,* at 647–52 (surveying the somewhat ambiguous legislative history of FOPA and noting that "it is impossible to avoid the conclusion that Congress was fully aware that its use of 'willfully' ... would require proof that the defendant actually knew of the illegality of his acts").

Second, the federal firearms statute in its various provisions employs both the mens rea standards of "knowingly" and "willfully." We have previously held that a defendant need not have knowledge of the law to violate the firearms statute "knowingly." *See United States v. Dancy*, 861 F.2d 77, 80–82 (5th Cir.1988). To give the term "willfully" in § 924(a)(1)(D) meaning, we must construe "willfully" as requiring a stricter mens rea than "knowingly." Reading "willfully" to mean "with knowledge of the law" is the most logical way to do so. *See Sanchez–Corcino*, 85 F.3d at 553; *Obiechie*, 38 F.3d at 315.

█ Thus, we find that knowledge of the law is required for a conviction under §§ 922(a)(5) and 924(a)(1)(D). The one circuit to hold otherwise only selectively examined the legislative history of FOPA and ignored the juxtaposition of the "knowingly" and "willfully" terms in the statute. *See United States v. Collins*, 957 F.2d 72, 75–76 (2d Cir.), *cert. denied*, 504 U.S. 944, 112 S.Ct. 2285, 119 L.Ed.2d 210 (1992). The Supreme Court has recently granted certiorari to review the Second Circuit's interpretation of the statute. *See United States v. Bryan*, 122 F.3d 90 (2d Cir.), *cert. granted*, — U.S. ——, 118 S.Ct. 622, 139 L.Ed.2d 507 (1997).

█ In fact, the government concedes that knowledge of the law is the correct legal standard, and neither party points to error in the jury instructions on the substantive

count.[1] The dispute here is whether there was sufficient evidence such that a reasonable jury could conclude that Rodriguez had the requisite knowledge of the legal prohibition contained in § 922(a)(5). The government did not present to the jury any direct evidence of Rodriguez's knowledge of the law. This failure, however, does not defeat the government's case, because it may also prove the "willfulness" of Rodriguez's actions through the use of circumstantial evidence. *See Edwards v. United States*, 334 F.2d 360, 364 (5th Cir.1964), *cert. denied*, 379 U.S. 1000, 85 S.Ct. 721, 13 L.Ed.2d 702 (1965).

The circumstantial evidence offered by the government was sufficient to permit the jury to infer that Rodriguez had knowledge of the law. Rodriguez knew that there was generally something illegal going on at the Burger King that day, for on the way to the restaurant she stated her concerns about the nature of the transaction and expressed a desire to abort it. Rodriguez also was very involved in Gomez's dealings. She spent a great deal of time working at "The Bunker" with him, and Gomez generally revealed all information about his activities to her. Finally, Rodriguez admitted that she had a personal interest in firearms.

▮ Taking all of this evidence together and viewing it in the light most favorable to the government, we find that the jury did not reach an unreasonable conclusion as to Rodriguez's knowledge of the law. *See United States v. Alix*, 86 F.3d 429, 435–36 (5th Cir. 1996). We recognize that simple awareness of general illegality is insufficient to satisfy a knowledge-of-the-law requirement. *See United States v. Covarrubias*, 94 F.3d 172, 175 (5th Cir.1996); *United States v. Hernandez*, 662 F.2d 289, 291–92 (5th Cir.1981). Here, however, the evidence went beyond Rodriguez's mere perception of general unlawfulness. Rodriguez was intimately involved in the firearms trade through her association with Gomez and "The Bunker." Moreover, she was aware that no participant in the scheme had a valid firearms license. The jury could have concluded that from this background, Rodriguez must have known that licenses were required to sell firearms to out-of-state residents. Furthermore, the jury could have determined that Rodriguez's actions on the day of the sting confirmed her understanding that the transaction violated a specific law. Rodriguez knew that the purchasers of the firearms were from out of state and she knew that the conspirators lacked a firearms license. Yet there was nothing else suspicious about the deal, as the firearms themselves were not contraband. It is difficult to explain why she was uneasy about the deal and why she felt the need to perform counter-surveillance operations during the transaction, unless she knew that the sale of firearms without a license to out-of-state residents was illegal. Taken together, the evidence could have led a jury reasonably to determine that Rodriguez acted with knowledge of the law.

In reaching this conclusion, we draw guidance from the jurisprudence involving 31 U.S.C. § 5324. Section 5324 makes it a crime for an individual to structure financial transactions to avoid the requirement in 31 U.S.C. § 5313 that financial institutions file a currency transaction report with the government for all cash transactions exceeding $10,-000. Before it was revised by Congress, 31 U.S.C. § 5322(a) set the mens rea for a § 5324 violation at "willfully." *Compare* Pub.L. No. 103–325 § 411(c)(1), 108 Stat. 2160, 2253 (1994), codified at 31 U.S.C.A. § 5322(a) (later eliminating the willfulness requirement). In 1994, the Supreme Court held that the willfulness element of § 5322(a)

---

**1.** The court charged the jury on the substantive count:

> To find the defendant guilty of the crime alleged in Count 2 of the indictment, you must be convinced that the government has proved each of the following beyond a reasonable doubt. First, that the defendant was not a licensed importer, licensed manufacturer, licensed dealer, or licensed collector of firearms; second, that the defendant knew that none of her co-defendants was a licensed dealer in firearms; and third, that the defendant willfully transferred, sold, gave, transported, or delivered one or more firearms to persons who were not licensed importers, licensed manufacturers, licensed dealers, or licensed collectors, knowing or having reasonable cause to believe that said persons did not reside in the same state in which the defendant resided. The term willfully means the voluntary, intentional violation of a known legal duty.

requires the government to demonstrate that defendants know that their activities violate the antistructuring statute. *See Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). Following *Ratzlaf,* conflict arose among the circuits about the nature of the evidence necessary to establish this willfulness. The courts that have been the strictest in requiring proof from the government on the willfulness element have found knowledge of the law only when both: 1) a defendant structured his transactions in a way that evaded the antistructuring law (an activity that is in and of itself difficult to explain absent knowledge of the law); and 2) the defendant either had a general consciousness of illegality, *see United States v. Hurley,* 63 F.3d 1, 16 (1st Cir.1995), *cert. denied,* 517 U.S. 1105, 116 S.Ct. 1322, 134 L.Ed.2d 474 (1996); *United States v. Vazquez,* 53 F.3d 1216, 1225–26 (11th Cir.1995), or he possessed a background that would support an inference of knowledge of the law, *see United States v. Simon,* 85 F.3d 906, 909–10 (2d Cir.) (defendant was a stockbroker), *cert. denied,* —— U.S. ——, 117 S.Ct. 517, 136 L.Ed.2d 406 (1996); *United States v. Tipton,* 56 F.3d 1009, 1013 (9th Cir.1995) (defendants were bankers), *cert. denied,* 516 U.S. 1072, 116 S.Ct. 773, 133 L.Ed.2d 725 (1996). *See generally United States v. Ismail,* 97 F.3d 50, 56–59 (4th Cir.1996) (discussing different courts' standards for "willfulness" under the CTR statute). The post-*Ratzlaf* courts that have construed the willfulness requirement of § 5322(a) more liberally have found evidence of knowledge of the law simply where a defendant went to great lengths to conceal his structuring. *See United States v. Marder,* 48 F.3d 564, 574 (1st Cir.), *cert. denied,* 514 U.S. 1056, 115 S.Ct. 1441, 131 L.Ed.2d 320 (1995); *United States v. Walker,* 25 F.3d 540, 548 n. 8 (7th Cir.), *cert. denied* 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994). Our Circuit has expressed doubts about the latter, less onerous method of establishing willfulness. *See United States v. Oreira,* 29 F.3d 185, 188 (5th Cir.1994). Rather, we have implied that to prove knowledge of the law under § 5322(a), evidence of structuring itself should be combined with evidence of a defendant's background or evidence of his awareness of the general illegality of his transactions. *See United States v. Pipkin,* 114 F.3d 528, 532–33 (5th Cir.1997).

Here, the evidence against Rodriguez would satisfy the test for willfulness of even the most stringent circuits construing the CTR statute. Much like how structuring a currency transaction to avoid the CTR requirement creates a strong inference that an individual knows of the requirement, Rodriguez's counter-surveillance operations are difficult to understand absent a conclusion that she knew that the sale of firearms without a license to out-of-state residents was illegal. In addition, Rodriguez's unease about the sale indicates her general consciousness of illegality, and her experience at "The Bunker" and with firearms gave her a background from which she should have been familiar with the firearms laws. Were this a CTR prosecution, no circuit would have difficulty concluding that Rodriguez acted "willfully."

Thus, we conclude that it was reasonable for the jury to find that Rodriguez had knowledge of the law. Although the government presented no direct evidence on this point, there was ample circumstantial evidence of Rodriguez's "willful" mens rea.

### III.

█ We can dispense with Rodriguez's second argument on appeal with less discussion. Rodriguez concedes that the trial court properly charged the jury about the knowledge-of-the-law requirement when instructing it on the substantive count, but she argues that the court erred in failing to repeat this high level of scienter in its instructions on the conspiracy count. To Rodriguez, this error permitted the jury to convict her on the conspiracy count for having the specific intent to conspire to violate the law, but not the specific intent to violate a known legal duty.

█ We find that the trial court did not abuse its discretion in framing the jury charge. *See United States v. Pettigrew,* 77 F.3d 1500, 1510 (5th Cir.1996). We will not reverse a conviction "because of a trial court's failure to give a requested instruction

if the charge, taken as a whole, accurately reflects the legal issues and does not allow the jury to convict for an offense not charged in the indictment." *United States v. Garza,* 754 F.2d 1202, 1210 (5th Cir.1985). Rodriguez does not dispute that the court's mens rea instruction on the substantive count correctly stated the law. Where the mens rea of an offense is properly addressed elsewhere in the jury charge, a trial court need not repeat that same mens rea requirement in its conspiracy instruction. *See United States v. Ortiz–Loya,* 777 F.2d 973, 983 (5th Cir.1985).

Rodriguez argues, however, that she was denied the benefit of the jury's consideration of the whole charge, because the trial court instructed the jury that "[e]ach charge and the evidence pertaining to it should be considered separately." Yet this instruction merely directed the jury not to convict or acquit Rodriguez on one count simply because it convicted or acquitted her on another. It did not inform the jury to disregard the court's instructions on the willfulness element on the substantive count when considering the conspiracy count.

This situation is fundamentally different from the one that we confronted in *United States v. McGuire,* 99 F.3d 671 (5th Cir.1996) (en banc). In *McGuire,* we implied that a defective instruction on a count on which the defendant was acquitted did not corrupt the otherwise proper instruction on the count of conviction because of the presence of the "consider each count separately" instruction. There, we employed the admonition to consider counts individually as a means of separating two different jury instructions. Here, on the other hand, the conspiracy count and the substantive count were inextricably linked. The jury could not possibly have considered the conspiracy count without looking to the instructions on the substantive count as well, for the substantive count essentially defined the offense that Rodriguez conspired to commit. We have never held, nor does *McGuire* indicate, that a district court in its conspiracy instruction must completely re-instruct about an underlying offense when that underlying crime is also charged as a substantive offense, about which the court has properly instructed the jury.

## IV.

For the foregoing reasons, Rodriguez's conviction is AFFIRMED.